UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

DANIEL STEVEN BERTINI,

Defendant.

**MEMORANDUM
OPINION & ORDER**

23 Cr. 61 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Daniel Bertini is charged with two counts of attempted bank burglary, in violation of 18 U.S.C. § 2113(a).  (Indictment (Dkt. No. 9))

Bertini has moved to suppress evidence obtained pursuant to search warrants issued for (1) cell site data concerning his cell phone; (2) his cell phone; and (3) his Gmail account.  (Def. Br. (Dkt. No. 29) at 7)[1]

For the reasons stated below, Bertini's motion to suppress will be (1) granted as to the cell site data; and (2) denied as moot with respect to evidence obtained from his cell phone and Gmail account.

**BACKGROUND**

## I.   **SEARCH WARRANT AFFIDAVIT**

Special Agent Christopher Harper of the Federal Bureau of Investigation submitted an eleven-page affidavit in support of the application for the search warrants.  (See Def. Br., Ex. A ("Harper Aff.") (Dkt. No. 29-1))  Agent Harper sought authorization to obtain, inter alia, cell site data relating to the cellphone assigned call number 929-286-3115, which he

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

alleged was owned and used by Defendant Bertini.  (Id. ¶ 4)  Agent Harper represented that there

was "probable cause . . . to believe that the [cell site data would] lead to evidence of bank

burglaries and/or attempted bank burglaries [committed] in violation of Title 18, United States

Code, Sections 2113 and 2. . . ."  (Id. ¶ 6)  The bank burglaries cited by Agent Harper were (1) a

March 7, 2021 attempted burglary at Investors Bank, 267 Fifth Avenue, New York, New York;

and (2) a March 10, 2021 attempted burglary at People's United Bank, 127 Seventh Avenue,

New York, New York.  (Id. ¶ 8)

       In his affidavit, Agent Harper describes video surveillance footage he had

reviewed from the two burglarized banks and from security cameras located in the vicinity of

Bertini's apartment building.[2]  (Id. ¶¶ 9, 13)

### A.    Allegations Concerning the March 7, 2021 Investors Bank Attempted Burglary

       The Investors Bank branch located at 267 Fifth Avenue is "less than one block"

away from the apartment building in which Bertini was living in 2021.  (Id. ¶¶ 11-12)

       Agent Harper states that security camera footage on March 7, 2021, at 3:49 p.m.,

shows a "male individual" he "believe[s] to be Bertini" walking out of Bertini's apartment

building.  (Id. ¶ 13(a))  The man walked westbound on 29th Street, in a direction opposite from

the Investors Bank branch.  (Id.)

       Agent Harper includes in his affidavit still images recovered from the security

camera footage.  The individual shown leaving Bertini's apartment building is wearing a hood,

his back is to the camera, and his face is not visible.  (Id. at Fig. 5)  This individual is dressed in

---

[2]  Agent Harper did not provide the address of Bertini's apartment building.

a blue jacket, black pants, and black shoes, and is carrying what appears to be a red and white Target bag.  (Id.)

Agent Harper further reports that video surveillance indicates that the break-in at the Investors Bank branch occurred at 4:11 p.m., after the bank had closed for the day.  (Id. ¶ 9(a))  "[A] male individual . . . used a screwdriver and a claw hammer to pry loose the bottom panel of an entry door to the Investors Branch and gain entry to the location."  (Id.)  The burglar "kicked open a door that accessed the bank teller area and opened and rummaged through the drawers and cabinets therein."  (Id.)  The burglar left six minutes later at 4:17 p.m.  (Id.)

The Investors Bank burglar was wearing "a green shirt, gray [cap], [blue] surgical mask, black pants, and black shoes," and was carrying a red bag with a black and white design.  (Id.)[3]  According to Agent Harper, "a gray/blue object" and "a white and red/pink object" can be seen inside the red bag.  (Id.)  The Court has reviewed still images of the burglar that are included in the agent's affidavit.  (Id. at Figs. 1-2)  While the burglar is dressed as the agent describes, the items inside the red bag are not discernible.  (Id.)

At 4:23 p.m., security camera footage shot outside Bertini's apartment building shows a man wearing a blue jacket and carrying a green and white bag.  (Id. ¶ 13(b))  Bertini's face is visible (id. at Figs. 6-7), and Agent Harper states that, "based on [his] personal interactions with Bertini, [he] recognize[s] the individual to be Bertini."  (Id.)  Bertini enters his apartment building at 4:34 p.m.  (Id.)

_____

[3]  This bag is not similar in appearance to the Target bag carried by the individual seen outside Bertini's apartment building earlier that day.  (Harper Aff. (Dkt. No. 29-1) ¶ 13(a))

**B.      Allegations Concerning the March 10, 2021**
**People's United Bank Attempted Burglary**

The attempted burglary at the People's United Bank branch at 127 Seventh Avenue took place on March 10, 2021.  (Id. ¶ 9(b))  This bank branch is located "less than a mile" from Bertini's apartment building.  (Id. ¶ 12)

Agent Harper states that at 11:36 p.m. on March 9, 2021, security camera footage shows "a male individual with Bertini's build" leave Bertini's apartment building.  (Id. ¶ 13(c))  Agent Harper does not describe what the man is wearing and does not state whether he is carrying anything.

Nearly three hours later – at 2:11 a.m. the following morning – the People's United Bank branch was broken into.  (Id. at ¶ 9(b))  The burglar used "a yellow crowbar to . . . pry loose the bottom panel of the entry door" in order to "gain entry" to the bank.  (Id.)  The burglar proceeded to the teller area and rummaged through drawers and cabinets.  The burglar left about five minutes later.  (Id.)

The burglar was wearing a "red or orange jacket, black hat, black pants, white shoes, and carrying what appeared to be a green and white bag."  (Id.)  According to Agent Harper, the burglar's green and white bag is similar in appearance to the green and white bag that Bertini was seen carrying on March 7, 2021 outside his apartment building.  (Id. ¶ 13(b))

According to Agent Harper, the man who left Bertini's apartment building returns to Bertini's apartment building at about 2:42 a.m.  (Id. ¶ 13(c))  The affidavit does not describe what this individual is wearing or whether he is carrying anything.

**C.      Bertini's Prior Bank Burglary Convictions**

Agent Harper's affidavit states that in 2016, Bertini burglarized the same Investors Bank branch located at 267 Fifth Avenue.  He "used a tool to pry open the bottom

panel of the front entry door to the bank," and he then "kicked open the door to the bank teller area, and opened and rummaged through the drawers and cabinets therein." (Id. ¶ 10(a))

On February 13, 2017, Bertini pled guilty to five bank burglaries he had committed in 2016, including a burglary of the Investors Bank branch at issue here. (Id.) Bertini was sentenced to four years' imprisonment and three years' supervised release. He began his period of supervised release on February 28, 2020. (Id. ¶ 10(b)) After his release from custody, Bertini returned to the same apartment he had been living in in 2016. (Id. ¶¶ 10(b)-(c), 11)

### D.   March 31, 2021 Search of Bertini's Apartment

On March 24, 2021, Magistrate Judge Kevin Fox signed a search warrant for Bertini's residence. The warrant authorized agents to seize "evidence and instrumentalities" of the two attempted burglaries at the Investors Bank and People's United Bank branches. (Id. ¶ 14) Agents executed the search warrant at Bertini's apartment on March 31, 2021. (Id. ¶ 15) Agent Harper says agents "recovered several items and articles of clothing that are consistent with the items and articles of clothing carried by [the individual who burglarized the two banks]," including (1) "the Grey/Blue Jacket and Grey/Blue Object"; (2) "the Target Bag and the White/Red Object"; (3) the "red jacket" worn by the People's United Bank burglar (which Agent Harper had previously described as "red or orange" (id. ¶ 9(b))); and (4) a screwdriver and a claw hammer. (Id. at ¶ 15)

There is no indication in Agent Harper's affidavit that many of the distinctive items that the burglar wore or used at the burglarized banks were recovered from Bertini's apartment, including (1) the yellow crowbar, green shirt, gray cap, and blue surgical mask used or worn by the Investors Bank burglar (see id. ¶ 9(a)); and (2) the white shoes and "distinctive" green and white bag worn or used by the People's United Bank burglar. (Id. ¶ 9(b))

**E.**  **Search Warrants Obtained After Search of Bertini's Apartment**

After the search of Bertini's apartment, the Government obtained search warrants for (1) cell site data regarding Bertini's cell phone; (2) Bertini's Gmail account; and (3) Bertini's cell phone.  In each instance, the Government submitted Agent Harper's affidavit – in substantially identical form – in support of the application.

The search warrant for the cell site data was obtained on May 26, 2021, and authorized a search for data for a six-day period between March 6, 2021 (the day before the Investors Bank attempted burglary) and March 11, 2021 (the day after the People's United Bank attempted burglary).  (Def. Br., Ex. A (Dkt. No. 29-1) at 1-3)  The search warrant for the Gmail account was obtained on September 27, 2021 (Def. Br., Ex. B (Dkt. No. 29-2)), and the search warrant for Bertini's cell phone was obtained on December 3, 2021.  (Def. Br., Ex. C (Dkt. No. 29-3))

**II.**  **PROCEDURAL HISTORY**

On February 1, 2023, the Government obtained an indictment charging Bertini with the attempted burglary of the Investors Bank branch on March 7, 2021, and the attempted burglary of the People's United Bank branch on March 10, 2021, in violation of 18 U.S.C § 2113(a).  (Indictment (Dkt. No. 9))

On August 25, 2023, Bertini moved to suppress evidence obtained from the search of his cell site data, Gmail account, and cell phone.  (Def. Mot. (Dkt. No. 28))  On October 27, 2023, this Court heard oral argument concerning the motion.  (Hearing Tr. (Dkt. No. 34))

The Government has represented that it "does not, at present[,] anticipate offering at trial any evidence derived from the [Gmail] Warrant or the Cellphone Warrant."  (Govt. Opp. (Dkt. No. 30) at 1)  Accordingly, to the extent that Bertini's motion to suppress is directed at

evidence obtained from his Gmail account and cellphone, the motion will be denied as moot.

See United States v. Barrett, No. 15-CR-103 (KAM), 2016 WL 3014667, at *6 (E.D.N.Y. May

23, 2016) (collecting cases).  The Court considers below Bertini's motion to suppress the cell site

data.

**DISCUSSION**

## I.    LEGAL STANDARD

The Fourth Amendment guarantees the right to be free from "unreasonable

searches and seizures," and provides that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation."  U.S. Const. amend. IV.  Government acquisition of "cell-site

records" – a "record of [a person's] physical movements" – is "a search within the meaning of

the Fourth Amendment."  Carpenter v. United States, 138 S. Ct. 2206, 2217, 2221 (2018).

In urging lower courts to use "caution" in "assessing probable cause" in the

context of search warrant applications for cell site data, the Second Circuit has noted that such

records "can reveal not only nearly the whole of an individual's movements but also, in the

process, much about his personal and professional life."  United States v. Lauria, 70 F.4th 106,

128-29 (2d Cir. 2023); see also Carpenter, 138 S. Ct. at 2217 (in ruling that government

acquisition of cell site data constitutes a Fourth Amendment search, noting that cell site data

"provides an all-encompassing record of the [cell phone user's] whereabouts . . . revealing not

only his particular movements, but through them his familial, political, professional, religious,

and sexual associations") (internal citations omitted).

In considering a warrant issued for cell site data, the Second Circuit summarized

the probable cause inquiry as follows:

> The law is well established that probable cause to search a location for – or, in the case of
> [cell site data], to demand – particular items or records is demonstrated where a totality of
> circumstances indicates a "fair probability that contraband or evidence of a crime will be

found" thereby.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  This standard does not demand "hard certainties," id. at 231, (internal quotation marks omitted), but it does require more than a "hunch," the latter being insufficient to support even an investigative stop, Terry v. Ohio, 392 U.S. 1, 22, 27 (1968).  Rather, probable cause must be grounded in sufficient facts to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act."  Illinois v. Gates, 462 U.S. at 231, 238, 241 (internal quotation marks omitted); see Florida v. Harris, 568 U.S. 237, 244 (2013) (describing probable cause as "practical," "common-sensical," "all-things-considered" standard for assessing probabilities in particular factual context).

Lauria, 70 F.4th at 128.

A magistrate judge's determination of probable cause to search is to "be paid great deference by reviewing courts."  Spinelli v. United States, 393 U.S. 410, 419 (1969).  This Court's "task," therefore, "is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination."  United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  The deference owed to a magistrate judge's determination does not, of course, preclude this Court from "properly conclud[ing] that . . . [a] warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of circumstances."  United States v. Leon, 468 U.S. 897, 915 (1984) (citing Gates, 462 U.S. at 238-29).  Indeed, the Supreme Court has expressly declined to hold "that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms."  Id. at 922.  Suppression of evidence thus "remains an appropriate remedy" where law enforcement agents lack "reasonable grounds for believing that the warrant was properly issued."  Id. at 922-23.

## II.   ANALYSIS

Bertini has moved to suppress cell site data regarding his cell phone, arguing that Agent Harper's affidavit failed to demonstrate a "sufficient nexus" between his cell phone and the two attempted burglaries.  (Def. Br. (Dkt. No. 29) at 17-20)  The Government argues that the

search warrant for the cell site data was supported by probable cause or that, in any event, the Government obtained the warrant in good faith.  See Leon, 468 U.S. at 897.

The probable cause issue here presents two related inquiries:  (1) whether Agent Harper's affidavit alleged facts are sufficient to demonstrate that there was probable cause to believe that Bertini had committed or attempted to commit a burglary of either the Investors Bank branch or the People's United Bank branch; and (2) if so, whether there was probable cause to believe that Bertini had the specified cell phone in his possession when he committed either bank burglary.

These inquiries are related, because "probable cause as to a person's criminal conduct can sometimes inform probable cause . . . to obtain records for electronic devices linked to that person."  Lauria, 70 F.4th at 130 n.14.  The two inquiries remain distinct, however, because "the existence of probable cause to arrest will not necessarily establish probable cause to search."  United States v. Gomez, 652 F. Supp. 461, 462 (E.D.N.Y. 1987) (quotations and citations omitted).  An arrest warrant is issued where there is probable cause to believe that a suspect committed an offense.  Steagald v. United States, 451 U.S. 204, 212-13 (1981).  By contrast, a search warrant for cell site data requires probable cause to believe that there is "'a fair probability that . . . evidence of a crime will be found'" in this data.  Lauria, 70 F.4th at 128 (quoting Gates, 462 U.S. at 238).  "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants."  Clark, 638 F.3d at 94 (quoting Stanford v. State of Texas, 379 U.S. 476, 481 (1965)).

A.   **Whether the Agent's Affidavit Demonstrated that there Was Probable Cause to Believe that Bertini Had Committed or Attempted to Commit a Bank Burglary**[4]

In arguing that Agent Harper's affidavit provides probable cause to believe that Bertini committed the two bank burglaries, the Government cites (1) the surveillance footage from outside Bertini's apartment building and at the targeted banks on the days of the attempted burglaries; (2) the "striking similarities" between these attempted bank burglaries and the 2016 bank burglaries Bertini committed; and (3) the items recovered from Bertini's apartment.  (Govt. Opp. (Dkt. No. 29) at 7-8; see also Harper Aff. (Dkt. No. 29-1) ¶¶ 7-16)  The evidence proffered by the Government falls short of probable cause, however.

---

[4]  At oral argument, defense counsel conceded that there was probable cause to believe that Bertini had committed a bank burglary, apparently based on the fact that Bertini had been indicted:

> Mr. Bertini was indicted.  We [are] not challenging whether there is probable cause to believe there is a crime committed.  We are only cha[lleging] probable cause to believe that evidence of a crime would be found on that cellphone.

(See Hearing Tr. (Dkt. No. 34) at 9:19-10:9)  This analysis is flawed, of course, because even though an indictment establishes probable cause, see United States v. Ciambrone, 601 F.2d 616, 622 (2d Cir. 1979), the magistrate judge's May 26, 2021 determination regarding the cell site data search warrant was based on evidence different from that later presented to the grand jury. In particular, and as noted above, a highly distinctive yellow crowbar is shown in the video of the March 10, 2021 People's United Bank burglary, and a yellow crowbar was recovered from Bertini on June 30, 2021.  (Cmplt. (Dkt. No. 1) ¶ 11(b))  This seizure took place after the May 26, 2021 search warrant was issued, however, and is thus not probative of probable cause at the time the warrant was issued.  (See Hearing Tr. (Dkt. No. 34) at 25:8-14)

In any event, the Court considers below whether Agent Harper's affidavit demonstrates that there was probable cause to believe that Bertini had committed a bank burglary because – as the Lauria court recognized – "probable cause as to a person's criminal conduct can sometimes inform probable cause . . . to obtain records for electronic devices linked to that person."  Lauria, 70 F.4th at 130 n.14.

1.   **Surveillance Video**

As an initial matter, the security camera footage from the vicinity of Bertini's apartment building is not probative.  While this footage shows an individual walking to or from the apartment building on four occasions within hours of the two bank burglaries (see Harper Aff. (Dkt. No. 29-1) ¶ 13), on three occasions, the footage does not show the individual's face. While Agent Harper claims that he was able to identify the individual as Bertini by his "build" (id. ¶ 13(c)), nothing in the affidavit mentions anything distinctive about Bertini's "build," whether height, weight, or other characteristic.

As to the bank surveillance video, the burglar is not identifiable from this footage. The Investors Bank burglar's face is obscured by a gray cap and surgical mask, and the People's United Bank burglar's face is obscured by a black hat.  (Id. ¶ 9)  It is not even clear from the bank footage whether the burglar is male or female.  Finally, the clothing worn by the Investors Bank and People's United Bank burglar(s) is not the same as the clothing worn by the individual seen leaving and returning to Bertini's apartment building.

As to the Investors Bank burglary, Agent Harper attempts to connect the individual seen leaving Bertini's apartment building with the individual shown breaking into the bank.  (Id. ¶ 9(a))  According to Agent Harper, the burglar is carrying a bag that contains "a gray/blue object" and a "white and red/pink object."  (Id.)  The agent's theory is that the individual seen leaving Bertini's apartment building changed his clothing and put his blue jacket and the red and white Target bag into a different bag.  (Id. ¶ 13(a); Govt. Opp. (Dkt. No. 30) at 4-5)  As discussed above, however, while the agent's affidavit contains still images of the bag the Investors Bank burglar carried, the contents of that bag are not discernable.

### 2.      Bertini's Prior Bank Burglaries

In arguing that there is probable cause to believe that Bertini committed the two

March 2021 bank burglaries, the Government points to Bertini's 2016 bank burglary conviction,

which involved five bank burglaries, including a burglary of the same Investors Bank branch at

issue here.  (Harper Aff. (Dkt. No. 29-1) ¶10(a))  In his affidavit, Agent Harper asserts that – in

burglarizing the Investors Bank branch in 2016 – Bertini used a "nearly identical method of

operation" to that of the March 7, 2021 burglar:  "he chose a time when each bank was closed; he

kicked, smashed, or pried open the glass doors of the bank to gain entry; and once inside, he used

a crowbar or screwdriver to open and rummage through drawers and cabinets."  (Govt. Opp.

(Dkt. No. 30) at 6)

At oral argument, the Government made clear that it is "not arguing that [the

burglary method at issue] is a unique pattern" (Hearing Tr. (Dkt. No. 34) at 24:10-17), however,

and there is nothing unique or unusual about the means and methods employed.  For example,

one would expect that a burglary of a bank would take place "when [the] bank was closed."

(Govt. Opp. (Dkt. No. 30) at 6)  And there is nothing unusual about obtaining illegal entry by

using tools to pry open a locked door.  In sum, the 2016 and 2021 bank burglaries at issue here

are not signature crimes.

While it makes sense from an investigative perspective for agents investigating a

burglary of the Investors Bank to consider who had burglarized the same bank in the past and

whether that person still lived next to the bank, a finding of probable cause requires more.

### 3.      Items Recovered from Bertini's Apartment

In arguing that there was probable cause to believe that Bertini had burglarized

the two banks, the Government also cites certain items found in Bertini's apartment, including a

screwdriver and a claw hammer, and a red jacket similar to that worn by the People's United

Bank burglar.  (Govt. Opp. (Dkt. No. 30) at 5-6)  But a screwdriver and claw hammer would likely be found in most New York City apartments.  As to the jacket worn by the People's United Bank burglar, Agent Harper first described its color as "red or orange."  (Harper Aff. (Dkt. No. 29-1) ¶ 9(b))  Given the agent's lack of certainty about the color, and the absence of any asserted distinctive features of the jacket, this Court cannot find that there is a fair probability that the red jacket recovered at Bertini's apartment is the same "red or orange" jacket worn by the People's United Bank burglar.

Finally, the fact that the most distinctive items that the burglar(s) wore or used at the burglarized banks were not found in Bertini's apartment – including (1) the yellow crowbar, the green shirt, the gray cap, and the blue surgical mask used or worn by the Investors Bank burglar (see id. ¶ 9(a)); and (2) the white shoes and "distinctive" green-and-white bag worn or used by the People's United Bank burglar (id. ¶ 9(b)) – cast doubt on whether he did in fact burglarize those banks.

*       *       *       *

In sum, Agent Harper's affidavit does not establish that there was probable cause to believe that Bertini had committed either the Investors Bank or the People's United Bank burglary.

**B.    Whether the Agent's Affidavit Demonstrated that there Was Probable Cause to Believe that Bertini Had His Cell Phone with Him When He Committed the Bank Burglaries or Had Used His Cell Phone to Facilitate the Burglaries**

Bertini argues that – even assuming that there was probable cause to believe that he had committed one or more of the bank burglaries – Agent Harper's affidavit does not provide any basis to believe that Bertini was carrying a cell phone when he committed the bank burglaries, or had used his cell phone to facilitate the burglaries.  There was thus no reason to

believe that cell site data for Bertini's cell phone would contain evidence of a crime. (Def. Br. (Dkt. No. 29) at 20-21)

There is no dispute here that Bertini owned and used a cell phone at the time the March 2021 bank burglaries were committed. (See Hearing Tr. (Dkt. No. 34) at 16:20-17:1) A U.S. Probation Officer informed Agent Harper of Bertini's cell phone number. (Harper Aff. (Dkt. No. 29-1) ¶ 17(a)) Bertini had used this cell phone to call his Probation Officer "multiple times," and Verizon Wireless records indicate that this cell phone had been used to call Bertini's mother more than 100 times since the beginning of the year. (Id. ¶¶ 17(b), (c))

To justify a search of cell site data concerning Bertini's cell phone, however, there must be probable cause to believe that Bertini (1) was carrying his cell phone at the time he committed one of the bank burglaries at issue, such that his phone's location would yield evidence of the burglaries; or (2) that he somehow used his cellphone at an earlier time in connection with or to facilitate the bank burglaries. In arguing that there was probable cause to believe that a search of the cell site data for Bertini's cell phone would yield evidence of a crime, the Government cites (1) Agent Harper's training and experience; and (2) "common sense." (Govt. Opp. (Dkt. No. 30) at 10-12; see also Harper Aff. (Dkt. No. 29-1) ¶ 18)

### 1.   **Relevant Allegations in Affidavit and Appeals to Common Sense**

In his affidavit, Agent Harper states that he has been a member of the FBI/NYPD Violent Crime Task Force since 2018 and has conducted "numerous investigations." (Harper Aff. (Dkt. No. 29-1) ¶ 1) In asserting that there is probable cause to believe that cell site data for Bertini's cell phone will contain evidence of bank burglary offenses, Agent Harper states the following:

- "Based on my training, experience, and participation in this investigation, I believe that individuals conspiring to commit offenses such as [bank burglaries and attempted bank burglaries] often use cellphones during and in furtherance of their criminal activity. For

example, individuals engaged in [bank burglaries and/or attempted bank burglaries] often use cellphones to conduct surveillance of, or to navigate to, their target locations" (id. ¶ 18);

- "Based on my training and experience, I also know that individuals often use cellphones for unrelated reasons prior to and/or following the commission of their criminal activity, and keep the cellphones on their person during the interim" (id. ¶ 19); and

- "For the foregoing reasons, I believe that individuals engaged in [bank burglaries and attempted bank burglaries] often have cellphones on their person prior to, during, and/or after the commission of such offenses, and that the Requested Information will assist law enforcement with determining the location of the [Defendant] at the time that the [burglaries and/or attempted bank burglaries] were committed." (Id. ¶ 20)

These allegations are not sufficient to demonstrate a fair probability that evidence of either bank burglary will be found in the cell site data for Bertini's cell phone.

As an initial matter, Agent Harper's assertion that "individuals conspiring to commit offenses [such as bank burglaries and attempted bank burglaries] often use cell phones" has no application here (id. ¶ 18), because the agent's affidavit contains no allegations suggesting that Bertini was engaged in a conspiracy. To the contrary, all of the allegations in the affidavit suggest that Bertini is acting alone. (See, e.g., id. ¶ 9(a) (referring to a single male suspect "gain[ing] entry to [the Investors Bank]); id. ¶ 9(b) (same as to People's Bank)) Because there are no allegations suggesting that Bertini was acting in concert with a co-conspirator to commit the burglaries, there is no reason to believe that he was communicating with anyone – either by cell phone or otherwise – about the burglaries. The Government conceded this point at oral argument, noting that the reference to a conspiracy "may not perfectly describe the situation here." (Hearing Tr. (Dkt. No. 34) at 20:18-20; see also id. at 18:11-21)

Agent Harper's reference to a conspiracy not only has no application here; but the absence of factual allegations showing conspiratorial conduct tends to undermine the Government's assertion that Bertini would likely have carried his cell phone to the scene of the

burglaries.  If Bertini had a co-conspirator and used his cell phone to communicate with his co-conspirator, it might be reasonable to expect that he would carry his cell phone while committing the offenses.  See, e.g., United States v. Disla Ramos, No. 22-CR-431 (LJL), 2022 WL 17830637, at *15 (S.D.N.Y. Dec. 21, 2022) (finding probable cause to search cell site data where defendant used a cell phone to communicate with his co-conspirators one hour before and immediately after the offense).  But there is no suggestion in Agent Harper's affidavit that Bertini was communicating with anyone about committing the bank burglaries.

Agent Harper next asserts that individuals engaged in bank burglaries often use their cell phones "to conduct surveillance of, or to navigate to, their target locations."  (Harper Aff. (Dkt. No. 29-1) ¶ 18)  While the Government argues that these factual allegations address "this case in particular" (Hearing Tr. (Dkt. No. 34) at 20:17-18), these allegations are – like the conspiracy allegation – not on point.  Given that Bertini lived a block away from the Investors Bank and had burglarized the bank before (Harper Aff. (Dkt. No. 29-1) ¶¶ 10(a), 12), there is no reason to believe that he would have used his cell phone to find the bank or to conduct surveillance of it.  While Bertini did not live next door to the People's United Bank, it was nonetheless close by – "less than a mile away" from his apartment.  (Id. ¶ 12)  Given that Bertini had lived in the neighborhood with his mother both in 2016-17 and in 2020-21 (id. ¶¶ 10(c), 11), there is no reason to believe that he would need to use his phone to "navigate to" the People's United Bank branch or to conduct surveillance of it.  (Id. ¶ 18)  There are, of course, no factual allegations suggesting that Bertini did in fact conduct surveillance of any location.

The affidavit's reliance on circumstances that are not present here – such as the existence of a conspiracy and the reference to use of cell phones to navigate to targeted locations – runs afoul of the Supreme Court's admonition that a showing of probable cause must be

16

premised on "particularized" facts rather than irrelevant generalizations.  Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (stating that a finding of probable cause must be based on "particularized [facts] with respect to [the Defendant]"); United States v. Falso, 544 F.3d 110, 124 (2d Cir. 2008) (noting that government must "gather 'evidence particularized to the target of the search' before the warrant application is made") (emphasis in original) (quoting United States v. Coreas, 419 F.3d 151, 158 (2d Cir. 2005)); see also United States v. Richardson, 861 F.2d 291, 294-95 (D.C. Cir. 1988) (search warrant "affidavits must accurately reflect the facts of the particular case").

At bottom, Agent Harper's assertion that there is probable cause to believe that Bertini was carrying his cell phone when he burglarized the banks rests on nothing more than the impermissible "hunch" referenced in Lauria.  70 F.4th at 128.  That "hunch" is in turn premised on the agent's belief that most people carry their cell phones most of the time, including when they commit crimes.  For example, Agent Harper states "that individuals often use cellphones for [reasons] unrelated" to their criminal activity (Harper Aff. (Dkt. No. 29-1) ¶ 19), and that people who commit crimes "often have cellphones on their person, prior to, during, and/or after the commission of such offenses."  (Id. ¶ 20)  But here the agent's affidavit alleges no facts suggesting that Bertini ever (1) used his cell phone in connection with committing or facilitating a bank burglary; (2) used his cell phone to communicate with anyone about committing a bank burglary; (3) carried his cell phone while committing a bank burglary; or (4) had reason to use or carry his cell phone in connection with committing or facilitating the bank burglaries at issue.

In opposing Bertini's suppression motion, the Government contends that it is mere "common sense" that most people in our society now carry cell phones.  (Govt. Br. (Dkt. No. 30) at 12)  "A showing of nexus does not require direct evidence and 'may[, of course,] be

17

based on reasonable inference from the facts presented based on common sense and experience.'" United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (quoting United States v. Buck, No. 84 CR. 220 (CSH), 1986 WL 12533, at *4 (S.D.N.Y. Oct. 24, 1986), rev'd on other grounds, 813 F.2d 588 (2d Cir. 1987)).  Acknowledging that cell phones have become ubiquitous in our society, a finding of probable cause cannot be premised solely on an agent's assertion that most people carry cell phones most of the time.  "[B]lanket generalization[s] about how 'people who commit crimes' act" – as in Agent Harper's affidavit – are "not sufficient" to support a probable cause finding.  United States v. Garcia, No. 20-CR-00058 (KAD), 2023 WL 4850553, at *7 (D. Conn. July 28, 2023).

What is missing here is some "'case-specific evidence'" that "'nudge[s] [Agent Harper's] training and experience across the line from sheer speculation to probable cause.'" Garcia, 2023 WL 4850553, at *7 (quoting United States v. Garlick, No. 22-CR-540 (VEC), 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023)); see also United States v. Guzman, No. 97-CR-786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) ("[A] search warrant must, at a minimum, aver some fact that connects [the location or material to be searched] to [a suspect's] alleged participation in criminal activity.").  To find probable cause here "'would be to license virtually automatic searches' of the cell phones [and extracted cell site data] of any [suspect]." Garcia, 2023 WL 4850553, at *8 (quoting Gomez, 652 F. Supp. at 463); see also Guzman, 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect.").

18

The cases cited by the Government (see Govt. Opp. (Dkt. No. 30) at 11) are not to the contrary, and merely confirm that blanket generalizations about the widespread use of cell phones are not sufficient.  In United States v. Akparanta, No. 19 CR. 363 (LGS), 2019 WL 5616875 (S.D.N.Y. Oct. 30, 2019), for example, the court found probable cause for the search of a prison guard's cell phone where the guard was alleged to have sexually abused female inmates. The search warrant affiant alleged that (1) the defendant had been observed using his cellphone in the location where criminal activity occurred; and (2) the defendant had collected phone numbers and social media details from his victims.  Id. at *4.

In other cases where courts have upheld warrants for cell site data, the affidavit submitted in support of the warrant alleged facts that linked the defendant's cell phone to the alleged criminal conduct.  In United States v. Harvey, No. 21-CR-335 (SJ), 2022 WL 684050, at *4 (E.D.N.Y. Mar. 8, 2022), for example, surveillance footage showed the defendant "using a phone moments after" the offense.  Likewise, in United States v. Baines, No. 20-CR-00261 (MPS), 2022 WL 35807, at *2 (D. Conn. Jan. 4, 2022), burglary suspects had used their cell phones to "communicate with each other during burglaries" and "to document their exploits during and after burglaries."  And in United States v. Robinson, No. 16-CR-545 (ADS), 2018 WL 5928120, at *16 (E.D.N.Y. Nov. 13, 2018), agents had recovered the cell phone at issue "at the scene of the crime."

Here, by contrast, Agent Harper's affidavit alleges no such facts concerning Bertini.  As discussed above, there are no factual allegations suggesting that Bertini ever used or carried his cell phone in connection with, or to facilitate, a bank burglary.  The required nexus between the material to be searched – cell site data for Bertini's cell phone – and the bank burglaries is not factually supported in Agent Harper's affidavit.  Accordingly, there was not

probable cause to believe that a search of the cell site data for Bertini's cell phone would yield

evidence of bank burglaries.

### C.  The Good Faith Exception

The Government argues that – even if the warrant was constitutionally invalid –

the search of the cell site data for Bertini's cell phone was executed in good faith, and therefore

"suppression is not an appropriate remedy." (Govt. Opp. (Dkt. No. 30) at 14)

"[E]vidence seized in reasonable, good-faith reliance on a search warrant" need

not be suppressed, even if the warrant "is subsequently held" to be unsupported by probable

cause. Leon, 468 U.S. at 904-05 (citation omitted). In so holding, the Leon court reasoned that,

> even assuming that the [exclusionary] rule effectively deters some police misconduct and
> provides incentives for the law enforcement profession as a whole to conduct itself in
> accord with the Fourth Amendment, it cannot be expected, and should not be applied, to
> deter objectively reasonable law enforcement activity.

Id. at 918-19. "'The burden is on the government to demonstrate the objective reasonableness of

the officers' good faith reliance' on an invalidated warrant." Clark, 638 F.3d at 100 (citing

United States v. George, 975 F.2d 72, 77 (2d Cir. 1992)).

Although "most searches conducted pursuant to a warrant [are] likely [to] fall

within [the] protection [of the good faith exception]" (id.), the exception does not apply where

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing
> magistrate wholly abandoned his or her judicial role; (3) where the application is
> so lacking in indicia of probable cause as to render reliance upon it unreasonable;
> and (4) where the warrant is so facially deficient that reliance upon it is
> unreasonable.

Id. (citing United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992)).

Here, Bertini argues that the affidavit submitted in support of the search warrant

for cell site data was "so lacking in indicia of probable cause as to render reliance upon it

unreasonable." (Def. Reply Br. (Dkt. No. 31) at 7-8). Search warrant affidavits "so lacking in

indicia of probable cause" are commonly known as "bare bones" affidavits. <u>United States v. Jones</u>, 43 F.4th 94, 111-12 (2d Cir. 2022). A "bare bones" search warrant affidavit is one that is "'totally devoid of factual circumstances to support [its] conclusory allegations.'" <u>Id.</u> (citing <u>Clark</u>, 638 F.3d at 103); <u>see also</u> <u>Gates</u>, 462 U.S. at 239 (noting that an issuing magistrate's "action cannot be a mere ratification of the bare conclusions of others"); <u>Burns v. United States</u>, 235 A.3d 758, 772 (D.C. 2020) ("Bare bones affidavits" are "unadorned . . . claim[s] of probable cause based on an affiant's training and experience," which "fail[ ] to provide the judge considering a warrant application a sufficient basis to assess compliance with the Fourth Amendment.").

        In considering whether the good faith exception to the exclusionary rule applies, courts apply an objective test:  whether the agents who "executed a warrant" and who "provided information material to the probable-cause determination" could have "harbored an objectively reasonable belief in the existence of probable cause." <u>Leon</u>, 468 U.S. at 923 n.24, 926; <u>United States v. George</u>, 975 F.2d 72, 77 (2d Cir. 1992) ("Reasonable reliance does not allow an officer to conduct a search with complete disregard of the warrant's validity because the standard of reasonableness is an objective one.") (internal quotation marks and alterations omitted).[5]

        Applying these standards, courts suppress evidence obtained from search warrants issued on the basis of "bare bones" affidavits that do not allege facts sufficient to draw a

---

[5] Under <u>Leon</u>'s objective standard, evidence may be subject to suppression even where there is no reason "to suspect any ill motive or subjective bad faith . . . of the officers who prepared and executed the [invalid] warrant." <u>United States v. Griffith</u>, 867 F.3d 1265, 1279 (D.C. Cir. 2017); <u>United States v. Wey</u>, 256 F. Supp. 3d 355, 408-09 (S.D.N.Y. 2017) ("The Court does not conclude that the agents acted with malice. But it does find that their conduct cannot be credibly explained by exigent circumstance, by simple mistake, or by mere negligence.").

plausible nexus between a suspect's alleged criminal conduct and the electronic device, material, or location to be searched. For example, in United States v. Garcia, 20-CR-58 (KAD), 2023 WL 4850553, at *1 (D. Conn. July 28, 2023), officers executed a search warrant for a suspect's cell phone. As to the nexus between the cell phone and the defendant's suspected criminal conduct, the defectives' affidavit stated that "people who commit crimes often communicate with their co-conspirators, before, during and after the commission of such crimes," and that "[t]he most common method of communications is through cell phones." Id. at *7. The court found that the detectives' assertion did not provide "sufficient indicia of probable cause" to support a search of the cell phone, even though – unlike in the instant case – there was ample evidence that the defendant was part of a conspiracy to commit murder and destroy evidence. Id. at *8, *12. The Garcia court went on to suppress the evidence obtained from the defendant's cell phone, finding that the "warrant was not supported by probable cause, was not sufficiently particularized, and was extraordinarily overbroad," and that therefore "the detectives had no objectively reasonable basis for relying upon it." Id. at *13.

Acknowledging that "most searches conducted pursuant to a warrant [are] likely [to] fall within [the] protection [of the good faith exception]," Clark, 638 F.3d at 100, the circumstances here present an exception to the general rule, because the search warrant affidavit was "so lacking in indicia of probable cause as to render reliance upon it unreasonable." Id. (citing United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).

As discussed above, in attempting to demonstrate probable cause, the affidavit cites to factual circumstances not present in the instant case, such as the existence of a conspiracy or the need to use a cell phone to locate a targeted location, where here, the Defendant (1) lived in a building located next to one of the targeted banks; and (2) had

previously burglarized the same bank.  Reliance on a search warrant affidavit cannot be

reasonable where that affidavit cites to factual circumstances that are not present.  See Ybarra,

444 U.S. at 91.

The search warrant affidavit is also devoid of factual allegations suggesting that

Bertini had carried or used his cell phone in connection with or to facilitate either bank burglary.

Given the absence of such facts, the agent's naked assertions that (1) "individuals often use

cellphones for unrelated reasons prior to and/or following the commission of criminal activity,"

and (2) "individuals engaged in [bank burglaries] often have cellphones on their person prior to,

during, and/or after the commission of such offenses" (Harper Aff. (Dkt. No. 29-1) ¶ 20), are

entirely conclusory and facially insufficient.  Gates, 462 U.S. at 239 ("An affidavit must provide

the magistrate with a substantial basis for determining the existence of probable cause, and [a]

wholly conclusory statement . . . fail[s] to meet this requirement.").

Reliance on the search warrant affidavit here likewise cannot be attributed to a

lack of clarity in the law.  The Government has not cited any case suggesting that a warrant for

cell site data can be premised solely on an agent's observation that most people carry cell phones

most of the time.  To the contrary, cases cited by the Government involve a suspect's actual use

of a cell phone in connection with a crime and/or the presence of the cell phone at the scene of

the crime.  Agent Harper is "charged with reasonable knowledge of what the law prohibits,"

United States v. Wey, 256 F. Supp. 3d 355, 408-09 (S.D.N.Y. 2017), and should have known

that a search warrant affidavit must include particularized, non-conclusory factual allegations

demonstrating a nexus between a suspect's alleged criminal conduct and the materials to be

searched.

In arguing that the good faith exception applies, the Government contends that the "agent reasonably thought [the warrant for the cell site data] was sufficient," given that the magistrate judge signed the warrant.  (Hearing Tr. (Dkt. No. 34) at 13:16-14:3)  But the test for application of the good faith exception is not whether a magistrate judge signed the search warrant.  Instead, this Court must consider whether a well-trained and experienced agent could have "harbored an objectively reasonable belief in the existence of probable cause." Leon, 468 U.S. at 926.  "Notwithstanding the deference that magistrates deserve," reviewing courts are instructed "not [to] defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining . . . probable cause." Id. at 915; Wey, 256 F. Supp. 3d at 398 ("[T]he mere presence of a warrant does not end the inquiry into objective reasonableness.") (internal citations omitted).  "[I]f the officer's good faith could be established by the mere fact that the judge approved the warrant application," then the good faith exception would "swallow the rule" that affidavits must provide a substantial basis for determining probable cause. United States v. Turner, 713 F. Supp. 714, 722-23 (D. Vt. 1989) (citing Leon, 468 U.S. at 923).

Citing United States v. Falso, 544 F.3d 110 (2d Cir. 2008), the Government argues that any "'error'" here was committed by the magistrate judge who "'issu[ed] the warrant, [and] not by the officers who executed it.'"  (Govt. Opp. (Dkt. No. 30) at 15) (quoting Falso, 544 F.3d at 129).  But Falso is not on point.

Falso is a child pornography case in which the Second Circuit considered whether a search warrant for the defendant's home – which authorized the seizure of evidence constituting child pornography – was supported by probable cause.  Probable cause was premised primarily on (1) an affiant's claim that the defendant had "appeared [to] have gained or attempted to gain" access to a website containing child pornography; and (2) an eighteen-year-

old misdemeanor conviction for sexual abuse of a minor.  <u>Falso</u>, 544 F.3d at 113.  A divided

panel of the court ruled that the challenged affidavit did not establish probable cause; a different

division of the panel ruled that the good faith exception applied.  <u>Id.</u> at 112-13.

        While the affiant in <u>Falso</u> relied primarily on conclusory statements based on his

training and experience in conducting child pornography investigations, his affidavit was

supported by the following factual allegations:  (1) "based upon the FBI investigation and the

forensic examination [of the child porn website], 'it appear[ed]' that Falso 'either gained access

or attempted to gain access to the [non-member] website www.cpfreedom.com'"; (2) the FBI

had obtained subscriber information – including email addresses – for the child porn website; (3)

one of the email addresses in the website's records was registered to Falso; (4) the address

associated with Falso's Yahoo email account had active internet service; and (5) eighteen years

earlier, Falso had been convicted of sexually abusing a seven-year-old girl.  <u>Id.</u> at 114.

        In moving to suppress, "Falso claimed that the presence of his e-mail address on

the cpfreedom.com website was an insufficient basis for probable cause in the absence of any

allegations in the affidavit that Falso was a member or subscriber to the website, or that the

overriding purpose of the website was the trading of child pornography."  <u>Id.</u> at 115.  A panel

majority agreed, concluding that the search warrant affidavit had not been supported by probable

cause.  <u>Id.</u> at 124.

        A different configuration of the panel concluded, however, that the good faith

exception applied, for the following two reasons:

> Even if there may have been an innocent explanation for the presence of Falso's e-mail
> address on the cpfreedom.com website, that does not undermine the officers' good-faith
> reliance on the warrant.  As this Court explained in <u>Fama</u>, [758 F.2d 834, 838 (2d Cir.
> 1985)]:  "The fact that an innocent explanation may be consistent with the facts
> alleged . . . does not negate probable cause.  Neither should it preclude a good faith belief
> in probable cause."  758 F.2d at 838 (citations omitted).

> Moreover, although a majority on this panel finds that probable cause was lacking, see
> supra Part I, that is certainly an issue upon which reasonable minds can differ, as
> reflected by the different approaches to the probable cause issue reflected here. . . .

Id. at 128.

As the above discussion of Falso makes clear, that case has no application here.
The search warrant affidavit in that case was supported by concrete facts linking the defendant to
a child pornography website.  And while a majority of the panel found probable cause lacking, a
different majority concluded that the good faith exception applied, because the probable cause
determination presented "an issue upon which reasonable minds can differ."  Id. at 128-29.
There are no such facts and circumstances here.

Unlike in Falso, and as discussed above, Agent Harper's affidavit is devoid of
facts demonstrating a nexus between the cell site data for Bertini's cell phone and the bank
burglaries he allegedly engaged in.  Given the absence of supporting facts and the references to
inapplicable circumstances – including the references to conspiracy and to the use of cell phones
to "navigate" to targeted locations – the affidavit contained "glaring deficienc[ies] that any
reasonable police officer would have known was constitutionally fatal."  Groh v. Ramirez, 540
U.S. 551, 564 (2004)

## CONCLUSION

For the reasons stated above, Bertini's motion to suppress is granted as to the
evidence obtained from the cell site data for his cell phone.  The motion to suppress is denied as
moot with respect to evidence obtained from Bertini's Gmail account and cell phone.

The Clerk of Court is directed to terminate the motion (Dkt. No. 28).

Dated: New York, New York
         November 29, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge